# EXHIBIT 2



**Crowe LLP**
Independent Member Crowe Global

3815 River Crossing Parkway, Suite 300,
Indianapolis, IN 46240-0977
Tel +1 317 569 8989
Fax +1 317 706 2660
www.crowe.com

February 8, 2023

Mr. Mark Rich
Steward Health Care System LLC
1900 N Pearl Street, Suite 2400
Dallas, Texas 75201

Dear Mr. Rich:

This letter confirms the arrangements for Crowe LLP ("Crowe" or "us" or "we" or "our") to provide the professional services discussed in this letter to Steward Health Care System LLC and its subsidiaries and affiliates (collectively "you", "your" or "Client"). The attached Crowe Engagement Terms, and any other attachments thereto, are integral parts of this letter, and such terms are incorporated herein.

AUDIT SERVICES

<u>Our Responsibilities</u>

We will audit and report on the consolidated financial statements ("Financial Statements") of the Client for the year ended December 31, 2022. The objective of the audit is the expression of an opinion on the Financial Statements. We will plan and perform the audit in accordance with auditing standards generally accepted in the United States of America (GAAS).

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the Financial Statements. The procedures selected depend on the auditor's judgment including the assessment of the risks that the Financial Statements could be misstated by an amount that we believe would influence the judgment made by a reasonable user of these Financial Statements. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the Financial Statements.

An audit requires that we obtain reasonable, rather than absolute, assurance about whether the Financial Statements are free of material misstatement, whether caused by error or fraud. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with GAAS will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Because of inherent limitations of an audit, together with the inherent limitations of internal control, an unavoidable risk that some material misstatements may not be detected exists, even though the audit is properly planned and performed in accordance with GAAS. An audit is not designed to detect error or fraud that is immaterial to the Financial Statements.

As part of our audit, we will conclude, based on the audit evidence obtained, whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the Client's ability to continue as a going concern for a reasonable period of time.

DocuSign Envelope ID: 81456E1E-3428-438C-A43F-ABFF8604A58E
Case: 1:24-cv-06069 Document #: 11-2 Filed: 08/12/24 Page 3 of 20 PageID #:142

Steward Health Care System LLC | 2 | February 8, 2023

In making our risk assessments, we obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances but not for the purpose of expressing an opinion on the effectiveness of the Client's internal control.

We will communicate in writing to the Audit Committee or Those Charged with Governance and management concerning any significant deficiencies or material weaknesses in internal control relevant to the audit of the Financial Statements that we have identified during the audit.

We will communicate to management other deficiencies in internal control identified during the audit that have not been communicated to management by other parties and that, in our professional judgment, are of sufficient importance to merit management's attention. We will also communicate certain matters related to the conduct of the audit to the Audit Committee or Those Charged with Governance, including (1) fraud involving senior management, and fraud (whether caused by senior management or other employees) that causes a material misstatement of the Financial Statements, (2) illegal acts that come to our attention (unless they are clearly inconsequential) (3) disagreements with management and other significant difficulties encountered in performing the audit and (4) various matters related to the Client's accounting policies and financial statements. Our engagement is not designed to address legal or regulatory matters, which matters should be discussed by you with your legal counsel.

We expect to issue a written report upon completion of our audit of the Client's Financial Statements. Our report will be addressed to the Board of Directors of the Client. Circumstances may arise in which it is necessary for us to modify our opinion, add an emphasis-of-matter or other matter paragraph or a separate section in the auditor's report, or withdraw from the engagement.

In addition to our report on the Financial Statements, we plan to evaluate the presentation of the following supplementary information in relation to the financial statements as a whole, and to report on whether this supplementary information is fairly stated, in all material respects, in relation to the financial statements as a whole.

- Consolidating Statement of Revenues and Expenses

Our audit and work product are intended for the benefit and use of the Client only. The audit will not be planned or conducted in contemplation of reliance by any other party or with respect to any specific transaction and is not intended to benefit or influence any other party. Therefore, items of possible interest to a third party may not be specifically addressed or matters may exist that could be assessed differently by a third party. The working papers for this engagement are the property of Crowe and constitute confidential information.

The Client's Responsibilities

The Client's management is responsible for the preparation and fair presentation of the Financial Statements in accordance with accounting principles generally accepted in the United States of America. Management is also responsible for the design, implementation and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to error or fraud.

Management has the responsibility to adopt sound accounting policies, maintain an adequate and efficient accounting system, safeguard assets, design and implement programs and controls to prevent and detect fraud and devise policies to ensure that the Client complies with applicable laws and regulations. Management's judgments are typically based on its knowledge and experience about past and current events and its expected courses of action. Management's responsibility for financial reporting includes establishing a process to prepare the accounting estimates included in the Financial Statements.

In preparing the financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the Client's ability to continue as a going concern for one year from the date the Financial Statements are available to be issued.

DocuSign Envelope ID: 81456E1E-3428-438C-A43F-ABEF8604A58E

Management is responsible for providing to us, on a timely basis, all information of which management is aware that is relevant to the preparation and fair presentation of the Financial Statements, such as records, documentation, and other matters. Management is also responsible for providing such other additional information we may request for the purpose of the audit, and unrestricted access to persons within the Client from whom we determine it necessary to obtain audit evidence. Additionally, the Audit Committee or Those Charged with Governance are responsible for informing us of their views about the risks of fraud, and their knowledge of any fraud or suspected fraud affecting the Client.

Management is responsible for adjusting the Financial Statements to correct material misstatements related to accounts or disclosures. As part of our audit process, we will request from management written confirmation concerning representations made to us in connection with the audit, including that the effects of any uncorrected misstatements aggregated by us during the audit are immaterial, both individually and in the aggregate, to the Financial Statements. Management acknowledges the importance of management's representations and responses to our inquiries, and that they will be utilized as part of the evidential matter we will rely on in forming our opinion.

Because of the importance of such information to our engagement, you agree to waive any claim against Crowe and its personnel for any liability and costs relating to or arising from any inaccuracy or incompleteness of information provided to us for purposes of this engagement.

Management is responsible for the preparation of the supplementary information identified above in accordance with the applicable criteria. As part of our audit process, we will request from management certain written representations regarding management's responsibilities in relation to the supplementary information presented, including but not limited to its fair presentation in accordance with the applicable criteria, the method of measurement and presentation and any significant assumptions or interpretations underlying the supplementary information. In addition, it is management's responsibility to include the auditor's report on supplementary information in any document that contains the supplementary information and that indicates that we have reported on such supplementary information. It is also management's responsibility to present the supplementary information with the audited Financial Statements or, if the supplementary information will not be presented with the audited Financial Statements, to make the audited Financial Statements readily available to the intended users of the supplementary information no later than the date of issuance by the Client of the supplementary information and the auditor's report thereon.

FINANCIAL STATEMENT PREPARATION SERVICES

You have also asked us to assist in the preparation of the Client's Financial Statements from the books and records of the Client as of and for the year(s) ending December 31, 2022. We will perform the services in accordance with applicable professional standards. We, in our sole professional judgment, reserve the right to refuse to do any procedure or take any action that could be construed as making management decisions or assuming management responsibilities. In connection with performing this service, you agree to: assume all management responsibilities including making all management decisions; oversee the service by designating an individual, preferably within senior management, who possesses suitable skill, knowledge, and/or experience; evaluate the adequacy and results of the services performed; and accept responsibility for the results of the services.

In delivering services to Client, Crowe may use subsidiaries owned and controlled by Crowe within and outside the United States. Crowe subsidiaries are subject to the same information security policies and requirements as Crowe LLP and will meet the requirements set forth in the confidentiality and data protection provisions of this Agreement.

FEES

Our fees, exclusive of out-of-pocket expenses and certain technology charges, are outlined below. Additionally, we may invoice you for actual out-of-pocket expenses (e.g. expedited delivery services, travel, business services, etc.). We will also invoice you for a business services fee, to be billed at 5% of other invoiced fees. The business services fee reflects our estimate of costs including but not limited to technology, data security, administrative support, processing support, and other related support on this

engagement. Our invoices are due and payable upon receipt. Invoices that are not paid within 30 days of receipt are subject to a monthly interest charge of one percent per month or the highest interest rate allowed by law, whichever is less, which we may elect to waive at our sole discretion, plus costs of collection including reasonable attorneys' fees. If any amounts invoiced remain unpaid 30 days after the invoice date, you agree that Crowe may, in its sole discretion, cease work until all such amounts are paid or terminate this engagement.

| Description of Services | Fee Amount |
|---|---|
| Audit of the Consolidated Financial Statements of Steward Health Care System LLC<br>• There will be two reports issued. One with a Consolidating Statement of Revenues and Expenses and One without. | $1,600,000 |

Travel and administrative fees will be capped at 10% of the fee quote.

Invoices will be submitted periodically between the date this letter is executed and the anticipated delivery date of our reports. Anticipated invoice dates and amounts are as follows:

| Invoice Date | Amount |
|---|---|
| March 1, 2023 | $500,000 |
| April 1, 2023 | $500,000 |
| May 1, 2023 | $300,000 |
| June 1, 2023 | $300,000 |
| July 1, 2023 | Remainder |

The Fee does not include Consultations on technical issues. Fees for these consultations will be done as needed and priced in advance with management.

The fees outlined above are based on certain assumptions. Those assumptions may be incorrect due to incomplete or inaccurate information provided, or circumstances may arise under which we must perform additional work, which in either case will require additional billings for our services. Examples of such circumstances include, but are not limited to:

- Changing service requirements
- New professional standards or regulatory requirements
- New financial statement disclosures
- Work caused due to the identification of, and management's correction of, inappropriate application of accounting pronouncements
- Erroneous or incomplete accounting records
- Evidence of material weakness or significant deficiencies in internal controls
- Substantial increases in the number of significant deficiencies in internal controls
- Regulatory examination matters
- Change in your organizational structure or size due to merger and acquisition activity or other events
- Change in your controls
- New or unusual transactions
- Agreed-upon level of preparation and assistance from your personnel not provided
- Numerous revisions to your information
- Lack of availability of appropriate Client personnel during fieldwork.
- Additional audit procedures relating to the impact of COVID-19 on Client or additional regulatory requirements relating thereto.

Additionally, to accommodate requests to reschedule fieldwork without reasonable notice, additional billings for our services could be required, and our assigned staffing and ability to meet agreed upon deadlines could be impacted.

Due to such potential changes in circumstance, we reserve the right to revise our fees. However, if such a change in circumstances arises or if some other significant change occurs that causes our fees to exceed our estimate, we will advise management.

Our fees are exclusive of taxes or similar charges, as well as customs, duties or tariffs, imposed in respect of the Services, any work product or any license, all of which Client agrees to pay if applicable or if they become applicable (other than taxes imposed on Crowe's income generally), without deduction from any fees or expenses invoiced to Client by Crowe.

The Client and Crowe agree that the Client may periodically request Crowe to provide additional services for accounting and reporting advice regarding completed transactions and potential or proposed transactions. The fees for such additional services will be based on Crowe's hourly billing rates plus expenses or as mutually agreed upon between the Client and Crowe.

To facilitate Crowe's presence at Client's premises, Client will provide Crowe with internet access while on Client's premises. Crowe will access the internet using a secure virtual private network. Crowe will be responsible for all internet activity performed by its personnel while on Client's premises. In the event Client does not provide Crowe with internet access while on Client's premises, Client will reimburse Crowe for the cost of internet access through other means while on Client's site.

MISCELLANEOUS

For purposes of this Miscellaneous section, the Acceptance section below, and all of the Crowe Engagement Terms, "Client" will mean the entity(ies) defined in the first paragraph of this letter and will also include all related parents, subsidiaries, and affiliates of Client who may receive or claim reliance upon any Crowe deliverable.

Crowe will provide the services to Client under this Agreement as an independent contractor and not as Client's partner, agent, employee, or joint venturer under this Agreement.  Neither Crowe nor Client will have any right, power or authority to bind the other party.

This engagement letter agreement (the "Agreement") reflects the entire agreement between the parties relating to the services (or any reports, deliverables or other work product) covered by this Agreement. The engagement letter and any attachments (including without limitation the attached Crowe Engagement Terms) are to be construed as a single document, with the provisions of each section applicable throughout. This Agreement may not be amended or varied except by a written document signed by each party. No provision of this Agreement will be deemed waived, unless such waiver will be in writing and signed by the party against which the waiver is sought to be enforced. It replaces and supersedes any other proposals, correspondence, agreements and understandings, whether written or oral, relating to the services covered by this letter, and each party agrees that in entering this Agreement, it has not relied on any oral or written representations, statements or other information not contained in or incorporated into this Agreement. Any non-disclosure or other confidentiality agreement is replaced and superseded by this Agreement. Each party shall remain obligated to the other party under all provisions of this Agreement that expressly or by their nature extend beyond and survive the expiration or termination of this Agreement. If any provision (in whole or in part) of this Agreement is found unenforceable or invalid, this will not affect the remainder of the provision or any other provisions in this Agreement, all of which will continue in effect as if the stricken portion had not been included. This Agreement may be executed in two or more actual, scanned, emailed, or electronically copied counterparts, each and all of which together are one and the same instrument. Accurate transmitted copies (transmitted copies are reproduced documents that are sent via mail, delivery, scanning, email, photocopy, facsimile or other process) of the executed Agreement or signature pages only (whether handwritten or electronic signature), will be considered and accepted by each party as documents equivalent to original documents and will be deemed valid, binding and enforceable by and against all parties. This Agreement, including any dispute arising out of or related to this Agreement and the parties' relationship generally, will be governed and construed in accordance with the laws of the State of Illinois applicable to agreements made and wholly performed in that state, without giving effect to its conflict of laws rules to the extent those rules would require applying another jurisdiction's laws.

DocuSign Envelope ID: 81456E1E-3428-438C-A43F-ABEF8604A58E

\* \* \* \* \*

We are pleased to have this opportunity to serve you, and we look forward to a continuing relationship. If the terms of this Agreement and the attached Crowe Engagement Terms are acceptable to you, please sign below and return one copy of this letter at your earliest convenience. Please contact us with any questions or concerns.

(Signature Page Follows)

**ACCEPTANCE**

I have reviewed the arrangements outlined above and in the attached "Crowe Engagement Terms," and I accept on behalf of the Client the terms and conditions as stated. By signing below, I represent and warrant that I am authorized by Client to accept the terms and conditions as stated.

IN WITNESS WHEREOF, Client and Crowe have duly executed this Agreement effective the date first written above.

| Steward Health Care System LLC | Crowe LLP |
|---|---|
| *[DocuSigned signature: 042EE4BF5396489...]* | *[DocuSigned signature: Mark A. Hull, 950BD863739B476...]* |
| Signature | Signature |
| Mark Rich | Mark Hull |
| Printed Name | Printed Name |
| Interim CFO | Partner |
| Title | Title |
| February 22, 2023 | February 22, 2023 |
| Date | Date |

## Crowe Engagement Terms

Crowe wants Client to understand the terms under which Crowe provides its services to Client and the basis under which Crowe determines its fees. These terms are part of the Agreement and apply to all services described in the Agreement as well as all other services provided to Client (collectively, the "Services"), unless and until a separate written agreement is executed by the parties for separate services. Any advice provided by Crowe is not intended to be, and is not, investment advice.

CLIENT'S ASSISTANCE – For Crowe to provide Services effectively and efficiently, Client agrees to provide Crowe timely with information requested and to make available to Crowe any personnel, systems, premises, records, or other information as reasonably requested by Crowe to perform the Services. Access to such personnel and information are key elements for Crowe's successful completion of Services and determination of fees. If for any reason this does not occur, a revised fee to reflect additional time or resources required by Crowe will be mutually agreed. Client agrees Crowe will have no responsibility for any delays related to a delay in providing such information to Crowe. Such information will be accurate and complete, and Client will inform Crowe of all significant tax, accounting and financial reporting matters of which Client is aware.

PROFESSIONAL STANDARDS – As a regulated professional services firm, Crowe must follow professional standards when applicable, including the Code of Professional Conduct of the American Institute of Certified Public Accountants ("AICPA"). Thus, if circumstances arise that, in Crowe's professional judgment, prevent it from completing the engagement, Crowe retains the right to take any course of action permitted by professional standards, including declining to express an opinion or issue other work product or terminating the engagement.

REPORTS – Any information, advice, recommendations or other content of any memoranda, reports, deliverables, work product, presentations, or other communications Crowe provides under this Agreement ("Reports"), other than Client's original information, are for Client's internal use only, consistent with the purpose of the Services. Client will not rely on any draft Report. Unless required by an audit or other attestation professional standard, Crowe will not be required to update any final Report for circumstances of which we become aware or events occurring after delivery.

CONFIDENTIALITY – Except as otherwise permitted by this Agreement or as agreed in writing, neither Crowe nor Client may disclose to third parties the contents of this Agreement or any information provided by or on behalf of the other that ought reasonably to be treated as confidential and/or proprietary. Client use of any Crowe work product will be limited to its stated purpose and to Client business use only. However, Client and Crowe each agree that either party may disclose such information to the extent that it: (i) is or becomes public other than through a breach of this Agreement, (ii) is subsequently received by the recipient from a third party who, to the recipient's knowledge, owes no obligation of confidentiality to the disclosing party with respect to that information, (iii) was known to the recipient at the time of disclosure or is thereafter created independently, (iv) is disclosed as necessary to enforce the recipient's rights under this Agreement, or (v) must be disclosed under applicable law, regulations, legal process or professional standards.

USE OF SUBCONTRACTORS FOR SERVICE DELIVERY – Crowe may engage third-party subcontractors in delivering Services to Client. Third-party subcontractors are not owned or controlled by Crowe (including without limitation Crowe Global member firms). If Crowe engages such a subcontractor to deliver Services to Client, Crowe will execute an agreement for the protection of Client's confidential information consistent with the provisions of this Agreement. Crowe will be solely responsible for the provision of Services (including those provided by subcontractors) and for the protection of Client's confidential information. The limitations in this Agreement on Client's remedies will also apply to any subcontractors.

USE OF THIRD-PARTIES IN CROWE OPERATIONS – Crowe uses third-party providers in the ordinary course of Crowe business operations. Third-party providers used in the ordinary course of Crowe business operations include without limitation email providers, cyber-security providers, and data hosting centers. Crowe also uses its subsidiaries (owned and controlled by Crowe) within and outside the United

States for various administrative and support roles. Crowe subsidiaries and any third-party providers used in the ordinary course of Crowe business operations will meet the confidentiality and data protection requirements in this Agreement. The limitations in this Agreement on Client's remedies will also apply to any such third-party providers and Crowe subsidiaries.

CLIENT-REQUIRED CLOUD USAGE – If Client requests that Crowe access files, documents or other information in a cloud-based or web-accessed hosting service or other third-party system accessed via the internet, including, without limitation iCloud, Dropbox, Google Docs, Google Drive, a data room hosted by a third party, or a similar service or website (collectively, "Cloud Storage"), Client will confirm with any third parties assisting with or hosting the Cloud Storage that either such third party or Client (and not Crowe) is responsible for complying with all applicable laws relating to the Cloud Storage and any information contained in the Cloud Storage, providing Crowe access to the information in the Cloud Storage, and protecting the information in the Cloud Storage from any unauthorized access, including without limitation unauthorized access to the information when in transit to or from the Cloud Storage. Client represents that it has authority to provide Crowe access to information in the Cloud Storage and that providing Crowe with such access complies with all applicable laws, regulations, and duties owed to third parties.

DATA PROTECTION – If Crowe holds or uses Client information that can be linked to specific individuals who are Client's customers ("Personal Data"), Crowe will treat it as confidential as described above and comply with applicable US state and federal law and professional regulations (including, for financial institution clients, the objectives of the Interagency Guidelines Establishing Information Security Standards) in disclosing or using such information to carry out the Services. The parties acknowledge and understand that while Crowe is a service provider as defined by the California Consumer Privacy Act of 2018 and processes information on behalf of Client and pursuant to this Agreement, Crowe retains its independence as required by applicable law and professional standards for purposes of providing attest services and other related professional services. Crowe will not (1) sell Personal Data to a third party, or (2) retain, use or disclose Personal Data for any purpose other than for (a) performing the Services and its obligations on this Agreement, (b) as otherwise set forth in this Agreement, (c) to detect security incidents and protect against fraud or illegal activity, (d) to enhance and develop our products and services, including through machine learning and other similar methods and (e) as necessary to comply with applicable law or professional standards. Crowe has implemented and will maintain physical, electronic and procedural safeguards reasonably designed to (i) protect the security, confidentiality and integrity of the Personal Data, (ii) prevent unauthorized access to or use of the Personal Data, and (iii) provide proper disposal of the Personal Data (collectively, the "Safeguards"). Client warrants (i) that it has the authority to provide the Personal Data to Crowe in connection with the Services, (ii) that Client has processed and provided the Personal Data to Crowe in accordance with applicable law, and (iii) will limit the Personal Data provided to Crowe to Personal Data necessary to perform the Services. To provide the Services, Client may also need to provide Crowe with access to Personal Data consisting of protected health information, financial account numbers, Social Security or other government-issued identification numbers, or other data that, if disclosed without authorization, would trigger notification requirements under applicable law ("Restricted Personal Data"). In the event Client provides Crowe access to Restricted Personal Data, Client will consult with Crowe on appropriate measures (consistent with legal requirements and professional standards applicable to Crowe) to protect the Restricted Personal Data, such as: deleting or masking unnecessary information before making it available to Crowe, using encryption when transferring it to Crowe, or providing it to Crowe only during on-site review on Client's site. Client will provide Crowe with Restricted Personal Data only in accordance with mutually agreed protective measures. Crowe and Client will each allow opportunistic TLS encryption to provide for secure email communication, and each party will notify the other in writing if it deactivates opportunistic TLS encryption. If Client fails to allow opportunistic TLS encryption, Client agrees that each party may use unencrypted electronic media to correspond or transmit information, and Client further agrees that such use of unencrypted media will not in itself constitute a breach of any confidentiality or other obligation relating to this Agreement. Otherwise, Client and Crowe agree each may use unencrypted electronic media to correspond or transmit information and such use will not in itself constitute a breach of any confidentiality obligations under this Agreement. Crowe will reasonably cooperate with Client in responding to or addressing any request from a consumer or data subject, a data privacy authority with jurisdiction, or the Client, as necessary to enable Client to comply with its obligations under applicable data protection laws and to the extent related to Personal Data processed by Crowe. Client will promptly

DocuSign Envelope ID: 81456E1F-3428-438C-A43F-ABFF8604A58F

reimburse Crowe for any out-of-pocket expenses and professional time (at Crowe's then-current hourly rates) incurred in connection with providing such cooperation. Client will provide prompt written notice to Crowe (with sufficient detailed instructions) of any request or other act that is required to be performed by Crowe. As appropriate, Crowe shall promptly delete or procure the deletion of the Personal Data, after the cessation of any Services involving the processing of Client's Personal Data, or otherwise aggregate or de-identify the Personal Data in such a way as to reasonably prevent reidentification. Notwithstanding the forgoing, Crowe may retain a copy of the Personal Data as permitted by applicable law or professional standards, provided that such Personal Data remain subject to the terms of this Agreement. If Crowe uses a third-party provider, Crowe will include terms substantially similar to those set forth in this Data Protection Paragraph into an agreement with the provider.

GENERAL DATA PROTECTION REGULATION COMPLIANCE – If and to the extent that Client provides personal data to Crowe subject to the European Union General Data Protection Regulation ("GDPR"), then in addition to the requirements of the above Data Protection section, this section will apply to such personal data ("EU Personal Data"). The parties agree that for purposes of processing the EU Personal Data, (a) Client will be the "Data Controller" as defined by the GDPR, meaning the organization that determines the purposes and means of processing the EU Personal Data; (b) Crowe will be the "Data Processor" as defined by GDPR, meaning the organization that processes the EU Personal Data on behalf of and under the instructions of the Data Controller; or (c) the parties will be classified as otherwise designated by a supervisory authority with jurisdiction. Client and Crowe each agree to comply with the GDPR requirements applicable to its respective role. Crowe has implemented and will maintain technical and organizational security safeguards reasonably designed to protect the security, confidentiality and integrity of the EU Personal Data. Client represents it has secured all required rights and authority, including consents and notices, to provide such EU Personal Data to Crowe, including without limitation authority to transfer such EU Personal Data to the U.S. or other applicable Country or otherwise make the EU Personal Data available to Crowe, for the duration of and purpose of Crowe providing the Services. The types of EU Personal Data to be processed include name, contact information, title, and other EU Personal Data that is transferred to Crowe in connection with the Services. The EU Personal Data relates to the data subject categories of individuals connected to Client, Client customers, Client vendors, and Client affiliates or subsidiaries ("Data Subjects"). Crowe will process the EU Personal Data for the following purpose: (x) to provide the Services in accordance with this Agreement, (y) to comply with other documented reasonable instructions provided by Client, and (z) to comply with applicable law. In the event of a Crowe breach incident in connection with EU Personal Data in the custody or control of Crowe, Crowe will promptly notify Client upon knowledge that a breach incident has occurred. Client has instructed Crowe not to contact any Data Subjects directly, unless required by applicable law. In the event that a supervisory authority with jurisdiction makes the determination that Crowe is a data controller, Client will reasonably cooperate with Crowe to enable Crowe to comply with its obligations under GDPR.

INTELLECTUAL PROPERTY - Any Deliverables, works, inventions, working papers, or other work product conceived, made or created by Crowe in rendering the Services under this Agreement ("Work Product"), and all intellectual property rights in such Work Product will be owned exclusively by Crowe. Further, Crowe will retain exclusive ownership or control of all intellectual property rights in any ideas, concepts, methodologies, data, software, designs, utilities, tools, models, techniques, systems, Reports, or other know-how that it develops, owns or licenses in connection with this Agreement ("Materials"). The foregoing ownership will be without any duty of accounting.

DATA USAGE AND AGGREGATIONS - Client hereby acknowledges and agrees that Crowe may, in its discretion, use any Client information or data provided to Crowe to improve Crowe services and Materials, including without limitation developing new Crowe services and software or other products. Client also agrees that Crowe may, in its discretion, aggregate Client content and data with content and data from other clients, other sources, or third parties ("Data Aggregations") for purposes including, without limitation, product and service development, commercialization, industry benchmarking, or quality improvement initiatives. Prior to, and as a precondition for, disclosing Data Aggregations to other Crowe customers or prospects, Crowe will anonymize any Client data or information in a manner sufficient to prevent such other customer or prospect from identifying Client or individuals who are Client customers. All Data Aggregations will be the sole and exclusive property of Crowe.

DocuSign Envelope ID: 81456E15-3428-438C-A43F-ABFF8604A58F

| Steward Health Care System LLC | 11 | February 8, 2023 |
|---|---|---|

LEGAL AND REGULATORY CHANGE – Crowe may periodically communicate to Client changes in laws, rules or regulations. However, Client has not engaged Crowe, and Crowe does not undertake an obligation, to advise Client of changes in (a) laws, rules, regulations, industry or market conditions, or (b) Client's own business practices or other circumstances (except to the extent required by professional standards). The scope of Services and the fees for Services are based on current laws and regulations. If changes in laws or regulations change Client's requirements or the scope of the Services, Crowe's fees will be modified to a mutually agreed amount to reflect the changed level of Crowe's effort.

PUBLICATION – Client agrees to obtain Crowe's specific permission before using any Report or Crowe work product or Crowe's firm's name in a published document, and Client agrees to submit to Crowe copies of such documents to obtain Crowe's permission before they are filed or published.

CLIENT REFERENCE – From time to time Crowe is requested by prospective clients to provide references for Crowe service offerings. Client agrees that Crowe may use Client's name and generally describe the nature of Crowe's engagement(s) with Client in marketing to prospects, and Crowe may also provide prospects with contact information for Client personnel familiar with Crowe's Services.

NO PUNITIVE OR CONSEQUENTIAL DAMAGES – Any liability of Crowe will not include any consequential, special, incidental, indirect, punitive, or exemplary damages or loss, nor any lost profits, goodwill, savings, or business opportunity, even if Crowe had reason to know of the possibility of such damages.

LIMIT OF LIABILITY – Except where it is judicially determined that Crowe performed its Services with recklessness or willful misconduct, Crowe's liability will not exceed fees paid by Client to Crowe for the portion of the work giving rise to liability. A claim for a return of fees paid is the exclusive remedy for any damages. This limit of liability will apply to the full extent allowed by law, regardless of the grounds or nature of any claim asserted, including, without limitation, to claims based on principles of contract, negligence or other tort, fiduciary duty, warranty, indemnity, statute or common law. This limit of liability will also apply after this Agreement.

INDEMNIFICATION FOR THIRD-PARTY CLAIMS – In the event of a legal proceeding or other claim brought against Crowe by a third party, except where it is judicially determined that Crowe performed Services with recklessness or willful misconduct, Client agrees to indemnify and hold harmless Crowe and its personnel against all costs, fees, expenses, damages and liabilities, including attorney fees and any other fees or defense costs, associated with such third-party claim, relating to or arising from any Services performed or work product provided by Crowe that Client uses or discloses to others or this engagement generally. This indemnification is intended to apply to the full extent allowed by law, regardless of the grounds or nature of any claim, liability, or damages asserted, including, without limitation, to claims, liability or damages based on principles of contract, negligence or other tort, fiduciary duty, warranty, indemnity, statute or common law. This indemnification will also apply after termination of this Agreement.

NO TRANSFER OR ASSIGNMENT OF CLAIMS – No claim against Crowe, or any recovery from or against Crowe, may be sold, assigned or otherwise transferred, in whole or in part.

TIME LIMIT ON CLAIMS – In no event will any action against Crowe, arising from or relating to this Agreement or the Services provided by Crowe relating to this engagement, be brought after the earlier of 1) one (1) year after the date on which occurred the act or omission alleged to have been the cause of the injury alleged; or 2) the expiration of the applicable statute of limitations or repose.

RESPONSE TO LEGAL PROCESS – If Crowe is requested by subpoena, request for information, or through some other legal process to produce documents or testimony pertaining to Client or Crowe's Services, and Crowe is not named as a party in the applicable proceeding, then Client will reimburse Crowe for its professional time, plus out-of-pocket expenses, as well as reasonable attorney fees, Crowe incurs in responding to such request.

MEDIATION – If a dispute arises, in whole or in part, out of or related to this engagement, or after the date of this agreement, between Client or any of Client's affiliates or principals and Crowe, and if the

dispute cannot be settled through negotiation, Client and Crowe agree first to try, in good faith, to settle the dispute by mediation administered by the American Arbitration Association, under its mediation rules for professional accounting and related services disputes, before resorting to litigation or any other dispute-resolution procedure. The results of mediation will be binding only upon agreement of each party to be bound. Costs of any mediation will be shared equally by both parties. Any mediation will be held in Chicago, Illinois.

JURY TRIAL WAIVER – FOR ALL DISPUTES RELATING TO OR ARISING BETWEEN THE PARTIES, THE PARTIES AGREE TO WAIVE A TRIAL BY JURY TO FACILITATE JUDICIAL RESOLUTION AND TO SAVE TIME AND EXPENSE. EACH PARTY AGREES IT HAS HAD THE OPPORTUNITY TO HAVE ITS LEGAL COUNSEL REVIEW THIS WAIVER. THIS WAIVER IS IRREVOCABLE, MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND APPLIES TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, OR MODIFICATIONS TO THIS AGREEMENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS WRITTEN CONSENT TO A BENCH TRIAL WITHOUT A JURY. HOWEVER, AND NOTWITHSTANDING THE FOREGOING, IF ANY COURT RULES OR FINDS THIS JURY TRIAL WAIVER TO BE UNENFORCEABLE AND INEFFECTIVE IN WAIVING A JURY, THEN ANY DISPUTE RELATING TO OR ARISING FROM THIS ENGAGEMENT OR THE PARTIES' RELATIONSHIP GENERALLY WILL BE RESOLVED BY ARBITRATION AS SET FORTH IN THE PARAGRAPH BELOW REGARDING "ARBITRATION."

ARBITRATION – If any court rules or finds that the JURY TRIAL WAIVER section is not enforceable, then any dispute between the parties relating to or arising from this Agreement or the parties' relationship generally will be settled by binding arbitration in Chicago, Illinois (or a location agreed in writing by the parties). Any issues concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of any of this Section, will be governed by the Federal Arbitration Act and resolved by the arbitrator(s). The arbitration will be governed by the Federal Arbitration Act and resolved by the arbitrator(s). Regardless of the amount in controversy, the arbitration will be administered by JAMS, Inc. ("JAMS"), pursuant to its Streamlined Arbitration Rules & Procedures or such other rules or procedures as the parties may agree in writing. In the event of a conflict between those rules and this Agreement, this Agreement will control. The parties may alter each of these rules by written agreement. If a party has a basis for injunctive relief, this paragraph will not preclude a party seeking and obtaining injunctive relief in a court of proper jurisdiction. The parties will agree within a reasonable period of time after notice is made of initiating the arbitration process whether to use one or three arbitrators, and if the parties cannot agree within fifteen (15) business days, the parties will use a single arbitrator. In any event the arbitrator(s) must be retired federal judges or attorneys with at least 15 years commercial law experience and no arbitrator may be appointed unless he or she has agreed to these procedures. If the parties cannot agree upon arbitrator(s) within an additional fifteen (15) business days, the arbitrator(s) will be selected by JAMS. Discovery will be permitted only as authorized by the arbitrator(s), and as a rule, the arbitrator(s) will not permit discovery except upon a showing of substantial need by a party. To the extent the arbitrator(s) permit discovery as to liability, the arbitrator(s) will also permit discovery as to causation, reliance, and damages. The arbitrator(s) will not permit a party to take more than six depositions, and no depositions may exceed five hours. The arbitrator(s) will have no power to make an award inconsistent with this Agreement. The arbitrator(s) will rule on a summary basis where possible, including without limitation on a motion to dismiss basis or on a summary judgment basis. The arbitrator(s) may enter such prehearing orders as may be appropriate to ensure a fair hearing. The hearing will be held within one year of the initiation of arbitration, or less, and the hearing must be held on continuous business days until concluded. The hearing must be concluded within ten (10) business days absent written agreement by the parties to the contrary. The time limits in this section are not jurisdictional. The arbitrator(s) will apply substantive law and may award injunctive relief or any other remedy available from a judge. The arbitrator(s) may award attorney fees and costs to the prevailing party, and in the event of a split or partial award, the arbitrator(s) may award costs or attorney fees in an equitable manner. Any award by the arbitrator(s) will be accompanied by a reasoned opinion describing the basis of the award. Any prior agreement regarding arbitration entered by the parties is replaced and superseded by this agreement. The arbitration will be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq., and judgment upon the award rendered by the arbitrator(s) may be entered by any court having jurisdiction thereof. All aspects of the arbitration will be treated by the parties and the arbitrator(s) as confidential.

DocuSign Envelope ID: 81456E1F-3428-438C-A43F-ABFF8604A58F
Case: 1:24-cv-06069 Document #: 11-2 Filed: 08/12/24 Page 14 of 20 PageID #:153

Steward Health Care System LLC                               13                                 February 8, 2023

NON-SOLICITATION – Each party acknowledges that it has invested substantially in recruiting, training and developing the personnel who render services with respect to the material aspects of the engagement ("Key Personnel"). The parties acknowledge that Key Personnel have knowledge of trade secrets or confidential information of their employers that may be of substantial benefit to the other party. The parties acknowledge that each business would be materially harmed if the other party was able to directly employ Key Personnel. Therefore, the parties agree that during the period of this Agreement and for one (1) year after its expiration or termination, neither party will solicit Key Personnel of the other party for employment or hire the Key Personnel of the other party without that party's written consent unless the hiring or engaging party pays to the other party a fee equal to the hired or engaged Key Personnel's compensation for the prior twelve-month period with the other party.

CROWE AND EQUAL OPPORTUNITY – Crowe abides by the principles of equal employment opportunity, including without limitation the requirements of 41 CFR 60-741.5(a) and 41 CFR 60-300.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, national origin, protected veteran status or disability. Crowe also abides by 29 CFR Part 471, Appendix A to Subpart A. The parties agree that the notice in this paragraph does not create any enforceable rights for any firm, organization, or individual.

CROWE GLOBAL NETWORK – Crowe LLP and its subsidiaries are independent members of Crowe Global, a Swiss organization. "Crowe" is the brand used by the Crowe Global network and its member firms, but it is not a worldwide partnership. Crowe Global and each of its members are separate and independent legal entities and do not obligate each other. Crowe LLP and its subsidiaries are not responsible or liable for any acts or omissions of Crowe Global or any other Crowe Global members, and Crowe LLP and its subsidiaries specifically disclaim any and all responsibility or liability for acts or omissions of Crowe Global or any other Crowe Global member. Crowe Global does not render any professional services and does not have an ownership or partnership interest in Crowe LLP or any other member. Crowe Global and its other members are not responsible or liable for any acts or omissions of Crowe LLP and its subsidiaries and specifically disclaim any and all responsibility or liability for acts or omissions of Crowe LLP and its subsidiaries. Visit www.crowe.com/disclosure for more information about Crowe LLP, its subsidiaries, and Crowe Global.

**HIPAA BUSINESS ASSOCIATE**

To the extent that Covered Entity discloses Protected Health Information to Business Associate, or Business Associate handles Protected Health Information on Covered Entity's behalf, in connection with services or products provided to Covered Entity, or as otherwise required or allowed by the Administrative Simplification provisions of the Health Insurance Portability and Accountability Act of 1996, as amended, ("HIPAA"), Covered Entity and Business Associate agree to the following terms and conditions, which are intended to comply with HIPAA, the Health Information Technology for Economic and Clinical Health Act ("HITECH Act") and their implementing regulations. This shall be applicable only in the event and to the extent Business Associate meets, with respect to Covered Entity, the definition of a Business Associate set forth at 45 C.F.R. §160.103, or applicable successor provisions. Now, therefore, in consideration of the foregoing and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties agree as follows:

1. **General Terms.**

    **(a)** This HIPAA Business Associate Addendum (this "Addendum") is Exhibit 1 to the dated February 8, 2023 ("Agreement") and is between Covered Entity and Business Associate.

    **(b)** "**Business Associate**" shall generally have the same meaning as the term "business associate" at 45 C.F.R. §160.103, and in reference to the party to this Addendum shall mean Crowe LLP, and its subsidiaries ("Crowe"), which are acting as an independent contractor to Covered Entity.

    **(c)** "**Covered Entity**" shall generally have the same meaning as the term "covered entity" at 45 C.F.R. §160.103, and in reference to the party to this Addendum shall mean, Steward Health Care System LLC.

    **(d)** "**HIPAA Rules**" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 C.F.R. Part 160 and Part 164.

    **(e)** **Other definitions:** The following terms used in this Addendum shall have the same meaning as those in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information (to the extent such Protected Health Information is created, transmitted, received, used, disclosed, accessed or maintained by Business Associate), Required By Law, Secretary, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use. Other terms shall have the definitions set forth in this Addendum.

2. **Obligations and Activities of Business Associate.**

    **(a)** Business Associate shall not use or disclose Protected Health Information other than as permitted or required by this Addendum or the Agreement or, as permitted or Required by Law.

    **(b)** Business Associate agrees to use appropriate safeguards, including compliance with Subpart C of 45 C.F.R. Part 164 with respect to electronic Protected Health Information, to prevent use or disclosure of the Protected Health Information other than as permitted by this Addendum.

    **(c)** Business Associate agrees to report to Covered Entity's Privacy Official any use or disclosure of Protected Health Information not provided for by this Addendum of which it becomes aware, including Breaches of Unsecured Protected Health Information, as required by 45 C.F.R. §164.410, and any Security Incident of which it becomes aware. For reports of incidents constituting a Breach, the report shall include, to the extent

available, the identification of each individual whose Unsecured Protected Health Information has been, or is reasonably believed by Business Associate to have been, accessed, acquired, or Disclosed during such Breach. Security Incidents that do not result in any unauthorized access, use, disclosure, modification, destruction of information or interference with system operations will be reported in the aggregate upon written request of Covered Entity in a manner and frequency mutually acceptable to the parties. Business Associate hereby reports to Covered Entity that incidents including, but not limited to, ping sweeps or other common network reconnaissance techniques, attempts to log on to a system with an invalid password or username, and denial of service attacks that do not result in a server being taken off line, may occur from time to time.

**(d)** In accordance with 45 C.F.R. §§164.502(e)(1)(ii) and 164.308(b)(2), if applicable, Business Associate agrees to ensure that subcontractors that create, receive, maintain, or transmit Protected Health Information on behalf of Business Associate agree to the same restrictions, conditions and requirements that apply through this Addendum to Business Associate with respect to such information.

**(e)** To the extent Business Associate has Protected Health Information in a Designated Record Set, and only to the extent required by HIPAA, Business Associate agrees to make available Protected Health Information in a Designated Record Set, to Covered Entity as necessary to satisfy Covered Entity's obligations under 45 C.F.R. §164.524. The Parties agree and acknowledge that it is Covered Entity's responsibility to respond to all such requests.

**(f)** Business Associate agrees to make Protected Health Information available for purposes of any amendment(s) to Protected Health Information in its possession contained in a Designated Record Set as agreed to by Covered Entity pursuant to 45 C.F.R. §164.526 or take other measures as necessary to satisfy Covered Entity's obligations under 45 C.F.R. §164.526. The Parties agree and acknowledge that it is Covered Entity's responsibility to respond to all such requests.

**(g)** Business Associate agrees to maintain and make available the information required to provide an accounting of disclosures to Covered Entity as necessary to satisfy Covered Entity's obligations under 45 C.F.R. §164.528. The Parties agree and acknowledge that it is Covered Entity's responsibility to respond to all such requests.

**(h)** To the extent Business Associate is to carry out one or more of Covered Entity's obligations under Subpart E of 45 C.F.R. Part 164 of the HIPAA Rules, Business Associate agrees to comply with the requirements of Subpart E that apply to Covered Entity in the performance of such obligation(s).

**(i)** Business Associate agrees to make its internal practices, books, and records related to Business Associate's use and disclosure of Protected Health Information received from Covered Entity available to the Secretary for purposes of determining compliance with the HIPAA Rules.

3. **Permitted Uses and Disclosures by Business Associate.**

**(a)** Business Associate may only use or disclose Protected Health Information as necessary to perform the services set forth in the Agreement, as permitted in this Addendum and the Agreement, and as otherwise permitted by the HIPAA Rules.

DocuSign Envelope ID: 81456E1F-3428-438C-A43F-ABFF8604A58F

    **(b)** Business Associate may Use or Disclose Protected Health Information as Required By Law.

    **(c)** Business Associate agrees to make uses and disclosures and requests for Protected Health Information consistent with the requirements in the HIPAA Rules regarding Minimum Necessary uses and disclosures. Covered Entity represents and warrants that its Minimum Necessary policies and procedures and the Notice of Privacy Practices are consistent with, and not more stringent than, the HIPAA Rules or, to the extent that Covered Entity's Notice of Privacy Practices or policies and procedures regarding the Minimum Necessary requirements of the HIPAA Rules impose additional particular restrictions on Business Associate, Covered Entity agrees to provide such policies to Business Associate in writing prior to requesting that Business Associate perform a particular function or activity on behalf of Covered Entity that would be affected by such policies and procedures.

    **(d)** Business Associate may create de-identified information that may be used and disclosed by Business Associate as Business Associate deems appropriate, provided that the information is de-identified in accordance with the HIPAA Rules.

    **(e)** Business Associate may use Protected Health Information to provide Data Aggregation services to Covered Entity. Business Associate may also use Protected Health Information to create, use and disclose a Limited Data Set consistent with the HIPAA Rules.

    **(f)** Business Associate may use and disclose Protected Health Information to report violations of law to appropriate Federal and State authorities, in a manner consistent with the HIPAA Rules.

    **(g)** Business Associate may not use or disclose Protected Health Information in a manner that would violate Subpart E of 45 C.F.R. Part 164 if done by Covered Entity, except for the specific uses and disclosures set forth below.

    **(h)** Business Associate may use Protected Health Information for the proper management and administration of Business Associate or to carry out the legal responsibilities of Business Associate.

    **(i)** Business Associate may disclose Protected Health Information for the proper management and administration of Business Associate or to carry out the legal responsibilities of Business Associate, provided that the disclosures are Required By Law or Business Associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as Required By Law or for the purposes for which it was disclosed to the person, and the person notifies Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

4. **Obligations of Covered Entity.**

    **(a)** Covered Entity agrees to notify Business Associate, in writing and in a timely manner, of any limitations in its Notice of Privacy Practices under 45 C.F.R. §164.520, and its policies regarding the "Minimum Necessary" requirements in 45 C.F.R. §164.502(b), to the extent that such changes may affect Business Associate's use or disclosure of Protected Health Information and to notify Business Associate of any material changes thereof;

DocuSign Envelope ID: 81456E1F-3428-438C-A43F-ABFF8604A58F
Case: 1:24-cv-06069 Document #: 11-2 Filed: 08/12/24 Page 18 of 20 PageID #:157

| Steward Health Care System LLC | 17 | February 8, 2023 |
|---|---|---|

**(b)** Covered Entity agrees to notify Business Associate, in writing and in a timely manner, of any changes in, or revocation of, permission by Individual to use or disclose Protected Health Information, to the extent that such changes may affect Business Associate's use or disclosure of Protected Health Information;

**(c)** Covered Entity agrees to notify Business Associate, in writing and in a timely manner, of any restriction on the use or disclosure of Protected Health Information to which Covered Entity has agreed or is required to abide by under 45 C.F.R. §164.522, to the extent that such restriction may affect Business Associate's use or disclosure of Protected Health Information.

**(d)** Covered Entity agrees to comply with all applicable state and federal privacy and security laws and regulations, including the HIPAA Rules. Covered Entity agrees to obtain any patient authorizations or consents that may be required under state or federal law or regulation in order to transmit Protected Health Information to Business Associate and to enable Business Associate and its subcontractors to use and disclose Protected Health Information as contemplated by this Addendum and the Agreement.

**(e)** Covered Entity shall not request that Business Associate use or disclose Protected Health Information in any manner that would not be permissible under the HIPAA Rules if done by Covered Entity, except that Business Associate may use or disclose Protected Health Information for its proper management and administration, data aggregation, and other activities specifically permitted by this Addendum.

**(f)** Covered Entity shall disclose only the Minimum Necessary Protected Health Information to accomplish the intended purpose of such disclosure or request. Prior to any disclosure, Covered Entity shall determine whether a Limited Data Set would be sufficient for the purpose.

5. **Term and Termination.**

    **(a)** The term of this Addendum shall continue for the term of the Agreement and following termination of the Agreement until all Protected Health Information is destroyed or returned to Covered Entity or its designee.

    **(b)** Upon Covered Entity's knowledge of a material breach of this Addendum by Business Associate, Covered Entity shall provide written notice to Business Associate and may terminate this Addendum if Business Associate does not cure the breach or end the violation within thirty (30) days.

    **(c)** Except as required by law or regulation, upon termination of the Agreement for any reason Business Associate shall return or destroy all Protected Health Information at Covered Entity's cost and expense. This provision shall apply to Protected Health Information that is in the possession of subcontractors or agents of Business Associate as well as Business Associate itself. Business Associate shall retain no copies of the Protected Health Information. In the event that Business Associate determines that returning or destroying the Protected Health Information is infeasible, Business Associate shall: (i) retain only that Protected Health Information which is necessary for Business Associate to continue its proper management and administration or to carry out its legal responsibilities; (ii) return or destroy the remaining Protected Health Information that Business Associate still maintains in any form; (iii) continue to use appropriate safeguards to comply with Subpart C of 45 C.F.R. Part 164 with respect to electronic Protected Health Information to prevent use or disclosure of the Protected Health Information, other than as provided for in this Section, for as long as Business Associate

retains the Protected Health Information; (iv) not use or disclose the Protected Health Information retained by Business Associate other than for the purpose for which such Protected Health Information was retained and subject to the same conditions set out in this Addendum which applied prior to termination; and (v) return to Covered Entity or destroy the Protected Health Information retained by Business Associate when it is no longer needed by Business Associate for its proper management and administration or to carry out its legal responsibilities. The parties agree that it is infeasible for Business Associate to return or destroy Protected Health Information it must maintain in supporting documentation to comply with professional standards of practice. This Section does not require Business Associate to segregate any Protected Health Information from other information maintained by Covered Entity on Business Associate's servers and Business Associate may comply with this requirement by returning or destroying all of the information maintained on its servers by Covered Entity. Business Associate's obligations under this subsection shall survive the termination of this Addendum.

6. **Miscellaneous.**

   (a) **Interpretation and Amendment**. A regulatory reference in this Addendum to a section of the HIPAA Rules means the section as in effect or as amended. Any ambiguity or inconsistency in this Addendum shall be interpreted to permit compliance with the HIPAA Rules. This Addendum supersedes any and all prior representations, understandings, or agreements, written or oral, concerning the subject matter herein, including conflicting provisions of the Agreement. Covered Entity and Business Associate agree to negotiate in good faith to take such action as is reasonably necessary to amend this Addendum from time to time as is necessary for Covered Entity to comply with the requirements of HIPAA as they may be amended from time to time; provided, however, that if such an amendment would materially increase the cost of Business Associate providing service under the Agreement, Business Associate shall have the option to terminate the Agreement on thirty (30) days advance notice. No change, amendment, or modification of this Addendum shall be valid unless set forth in writing by both parties.

   (b) **Survival**. The respective rights and obligations of Business Associate and Covered Entity under this Addendum shall survive the termination of the Agreement. Business Associate's obligations shall end when all of the Protected Health Information provided by Covered Entity to Business Associate, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity.

   (c) **Governing Law**. To the extent not preempted by federal law, this Addendum shall be governed and construed in accordance with the state laws governing the Agreement, without regard to conflicts of law provisions that would require the application of the law of another state.

   (d) **No Third Party Rights**. The terms and conditions of this Addendum are intended for the sole benefit of Business Associate and Covered Entity and do not create any third party rights.

   (e) **Binding Nature and Benefits**. This Addendum binds and benefits the parties, their respective successors, and their permitted assigns.

   (f) **Severability**. Whenever possible, each provision of this Addendum shall be interpreted so as to be effective and valid under applicable law. If any provision of this Addendum should be prohibited or found invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the other of such provision or the remaining provisions of this Addendum; provided, however, that if

any such invalid provision is material to an extent that the party would not have entered into the Addendum absent such provision, then that party may terminate the Addendum upon ninety (90) calendar days' prior written notice to the other party.

**(g)** **Counterparts**. This Addendum may be executed in multiple counterparts, which shall constitute a single addendum, and by facsimile or pdf signatures, which shall be treated as originals.

| Steward Health Care System LLC | Crowe LLP |
|---|---|
| *DocuSigned by:* [signature] 042EE4BF5396489... | *DocuSigned by:* [signature] Mark A. Hull 950BD863739B476... |
| Signature | Signature |
| Mark Rich | Mark Hull |
| Printed Name | Printed Name |
| Interim CFO | Partner |
| Title | Title |
| February 22, 2023 | February 22, 2023 |
| Date | Date |